# 12-5082-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

———— ⤜⤛ ————

DANIEL B. GRAVES,

*Plaintiff-Appellant,*

*v.*

DEUTSCHE BANK SECURITIES, INC.,

*Defendant-Appellee.*

————————

*On Appeal from the United States District Court
for the Southern District of New York (New York City)*

## BRIEF FOR DEFENDANT-APPELLEE

Clifford H. Fonstein
Nicholas H. De Baun
Cameron Alexander Smith
SEYFARTH SHAW LLP
620 Eighth Avenue
New York, New York 10018
212-218-5500

*Attorneys for Defendant-Appellee*

## **Federal Rule of Appellate Procedure 26.1 Corporate Disclosure Statement**

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee Deutsche Bank Securities Inc. ("DBSI") states that the following entities are either DBSI's parent corporations or own 10% or more of DBSI's stock:

DBSI is a wholly owned subsidiary of DB U.S. Financial Markets Holding Corporation, which in turn is a wholly owned subsidiary of Taunus Corporation, which in turn is a wholly owned subsidiary of Deutsche Bank A.G., a publicly traded corporation. Other than the aforementioned corporate parents, there is no publicly held corporation that owns 10% or more of DBSI's stock.

# **TABLE OF CONTENTS**

**Page**

STATEMENT OF THE ISSUES.................................................................1

STATEMENT OF THE CASE...............................................................1

STATEMENT OF FACTS ....................................................................4

PROCEDURAL HISTORY...................................................................9

STANDARD OF REVIEW ................................................................11

SUMMARY OF ARGUMENT ..........................................................13

ARGUMENT .....................................................................................14

I.    THE UNDISPUTED EVIDENCE ESTABLISHES NO AGE
      DISCRIMINATION. ...................................................................14

      A.    DBSI Has Established Legitimate Business Reasons for The
            Employment Decisions Made Regarding Graves. ...........................17

            1.    Graves Was Selected for the RIF Because He was the
                  Lowest Performing Managing Director.................................18

            2.    DBSI Did Not "Set Graves Up to Fail" by Transferring
                  Graves's Accounts to Younger Bankers.................................23

            3.    Graves Was Not Offered a "Soft Landing" as That Was
                  Not a Customary Benefit. ......................................................26

            4.    Graves Was Considered for a Transfer....................................28

            5.    Graves Was Not Paid a Bonus Because He Was Not
                  Eligible to Receive One Under DBSI's Consistently
                  Applied Compensation Policy. ..............................................29

      B.    Graves Has Failed to Adduce Any Evidence to Prove DBSI's
            Articulated Reasons Were Pretextual or That Age Had
            Anything To Do With the Employment Decisions Relating to
            Graves.....................................................................................31

i

**<u>TABLE OF CONTENTS</u>**
**(Cont.)**

<u>Page</u>

    1.    Amling's Purported Comment Is Inconclusive ......................31

    2.    Graves Was Not Materially Older Than The Purported "Younger Bankers" ................................................................37

    3.    The MD Who Was Retained Was Older Than Graves............39

    4.    DBSI Conveyed These Reasons for Its Employment Decisions to the EEOC and DBSI's Position Statement Does Not Establish Pretext. .......................................................40

II.    GRAVES CANNOT ESTABLISH A RETALIATION CLAIM. ...............43

    A.    The Decision to Terminate Graves's Employment Was Communicated to Him Before His Alleged Complaint. .....................44

    B.    The DBSI Actions Allegedly Taken After Graves's Complaint Do Not Constitute Retaliation. ..............................................................45

    C.    This Court Need Not Determine whether <u>Lambert v. Genesee Hospital</u> Remains Good Law; Graves's FLSA Retaliation Claim Fails Under Any Theory..........................................................49

        1.    The Court Need Not Decide Whether <u>Kasten</u> Overruled <u>Lambert.</u> ...................................................................50

        2.    Graves Has Not Set Forth A Cognizable FLSA Claim. ...........52

        3.    Graves's FLSA Retaliation Claim Fails for the Same Reasons that his ADEA and NYCHRL Retaliation Claims Fail. ................................................................................54

III.    THE DISTRICT COURT PROPERLY REFUSED TO CONSIDER GRAVES'S IMPROPER SUBMISSIONS. ...................................................55

CONCLUSION ....................................................................................................59

# TABLE OF AUTHORITIES

<b>Page(s)</b>

CASES

Abrahamson v. Bd. of Educ. of Wappingers Falls Cent. Sch. Dist.,
374 F.3d 66 (2d Cir. 2004) ................................................................53

Abreu v. New York City Police Dept.,
329 F. App'x 296 (2d Cir. 2009) ..............................................12, 55

Adkins v. Warden,
354 F. App'x 564 (2d Cir. 2009) .......................................................50

Alliance Security Prods., Inc. v. Fleming Co.,
471 F. Supp. 2d 452 (S.D.N.Y. 2007) aff'd, 290 F. App'x 380 (2d Cir.
2008) ................................................................................................55

Amnesty Am. v. Town of West Hartford,
288 F.3d 467 (2d Cir. 2002) ..............................................................21

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ...........................................................................11

Aneja v. M.A. Angeliades, Inc.,
No. 05-9678, 2008 U.S. Dist. LEXIS 30602 (S.D.N.Y. Mar. 31, 2008) ..........42

Baguer v Spanish Broadcasting Sys.,
No. 04 Civ. 8393, 2010 WL 2813632 (S.D.N.Y. July 12, 2010), aff'd,
423 F. App'x 102 (2d Cir. 2011) ...............................................17, 38

Bay v. Times Mirror Magazines, Inc.,
936 F.2d 112 (2d Cir. 1991) ..............................................................39

Beshty v. General Motors,
327 F. Supp. 2d 208 (W.D.N.Y. 2004) ..............................................34

Birkbeck v. Marvel Lighting Corp.,
30 F.3d 507 (4th Cir. 1994) ...............................................................34

Brock v. Casey Truck Sales, Inc.,
839 F.2d 872 (2d Cir. 1988) ..............................................................54

Butts v. N.Y.C. Dep't of Hous. Pres. and Dev.,
    No. 00-CV-6307, 2007 WL 259937 (S.D.N.Y. Jan. 29, 2007)..........................46

Campbell v. Alliance Nat'l Inc.,
    107 F. Supp. 2d 234 (S.D.N.Y. 2000) ..................................................33

Catanzaro v. City of N.Y.,
    No. 10 Civ. 1827, 2011 WL 335648 (S.D.N.Y. Jan. 25, 2011), aff'd, 486
    F. App'x 899 (2d Cir. 2012) .................................................................38

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986).............................................................................43

Chamber v. Capital Cities/ABC,
    851 F. Supp. 543 (S.D.N.Y 1994) .....................................................53

Colon v. Trump Int'l Hotel & Tower,
    No. 10-Civ.-4794, 2011 WL 6092299 (S.D.N.Y. Dec. 7, 2011).........................16

Contemporary Mission, Inc. v. U.S. Postal Serv.,
    648 F.2d 97 (2d Cir. 1981) .................................................................12

Crawford v. Dep't of Investigation,
    324 F. App'x 139 (2d Cir. 2009) .........................................................33

D'Cunha v. Genovese/Eckerd Corp.,
    479 F.3d 193 (2d Cir. 2007) ...............................................................38

DeSantis v. Deutsche Bank Trust Co. Am., Inc.,
    501 F. Supp. 2d 593 (S.D.N.Y. 2007) ................................................30

Dixon v. Int'l Fed. of Accountants,
    416 F. App'x 107 (2d Cir. 2011) .........................................................32

Emanuel v. Oliver, Wyman & Co. LLC,
    85 F. Supp. 2d 321 (S.D.N.Y. 2000) ..................................................35

European Cmty. v. RJR Nabisco, Inc.,
    424 F.3d 175 (2d Cir. 2005) ...............................................................50

Fleming v. MaxMara USA, Inc.,
    371 F. App'x 115 (2d Cir. 2010) .........................................................44

Fried v. LVI Servs., Inc.,
    500 F. App'x 39 (2d Cir. 2012) ..............................................................31, 33, 44

Garrett v. Garden City Hotel, Inc.,
    No. 05 Civ. 0962, 2007 WL 1174891 (E.D.N.Y. Apr. 19, 2007) ....................45

Gioia v. Forbes Media LLC,
    501 F. App'x 52 (2d Cir. 2012) ...................................................................32, 37

Gioia v. Forbes Media LLC,
    No. 09 Civ. 6114, 2011 WL 4549607 (S.D.N.Y. Sept. 30, 2011), aff'd,
    501 F. App'x 52 (2d Cir. 2012) ...........................................................................33

Gorzynski v. JetBlue Airways Corp.,
    596 F.3d 93 (2d Cir. 2010) ...........................................................................15, 43

Grady v. Affiliated Cent. Inc.,
    130 F.3d 553 (2d Cir. 1997) .........................................................................35, 36

Graham v. Long Island R.R.,
    230 F.3d 34 (2d Cir. 2000) ...................................................................................21

Grosjean v. First Energy Corp.,
    349 F.3d 332 (6th Cir. 2003) .........................................................24, 38, 46, 49

Gross v. FBL Fin. Serv. Inc.,
    557 U.S. 167 (2009)...........................................................................14, 15, 31, 44

Gross v. N.B.C., Inc.,
    232 F. Supp. 2d 58 (S.D.N.Y. 2002) ..................................................................22

Holcomb v. Iona Coll.,
    521 F. 3d 130 (2d Cir. 2008) ...............................................................................12

Holowecki v. Federal Express Corp.,
    382 F. App'x 42 (2d Cir. 2010) ...................................................................15, 20

Holt v. KMI-Cont'l, Inc.,
    95 F.3d 123 (2d Cir. 1996) ...................................................................................19

Holtz v. Rockefeller & Co., Inc.,
    258 F.3d 62 (2d Cir. 2001) ...................................................................................56

Hunter v. Deutsche Bank AG,
    56 A.D.3d 274, 866 N.Y.S.2d 670 (1st Dep't 2008) ...........................................30

Inflight Newspapers, Inc. v. Magazines In-Flight, LLC,
    990 F. Supp. 119 (E.D.N.Y. 1997) ......................................................................57

Isaac v. City of N.Y.,
    701 F. Supp. 2d 477 (S.D.N.Y. 2010) ...........................................................12, 16

Iuorno v. DuPont Pharms. Co.,
    129 F. App'x 637 (2d Cir. 2005) .........................................................................32

Julius v. Dep't of Human Res. Admin.,
    No. 08 Civ. 3091, 2010 WL 1253163 (S.D.N.Y. Mar. 24, 2010) ......................17

Kaplan v. Beth Israel Med. Ctr.,
    No. 07 Civ. 8842, 2010 WL 1253967 (S.D.N.Y. Mar. 31, 2010) ...............17, 35

Kassman v. KPMG LLP,
    11 Civ. 3743, 2013 U.S. Dist. LEXIS 17491 (S.D.N.Y. Feb. 7, 2013)..............51

Kasten v. Saint-Gobain Performance Plastics, Corp.,
    __ U.S. __, 131 S. Ct. 1325, 179 L.Ed.2d 379 (2011) ...........................49, 50, 51

Kaytor v. Elec. Boat Corp.,
    609 F.3d 537 (2d Cir. 2010) ...............................................................................47

Kearney v. ABN AMRO, Inc.,
    738 F. Supp. 2d 419 (S.D.N.Y. 2010) ...........................................................34, 45

Kemp v. Metro-North R.R,
    No. 04 Civ. 9926, 2007 U.S. Dist. LEXIS 43568 (S.D.N.Y. June 14,
    2007), aff'd, 316 F. App'x 25 (2d Cir. 2009) ......................................................45

Kimel v. Florida Bd. of Regents,
    528 U.S. 62 (2000) ..............................................................................................53

Lambert v. Genesee Hosp.,
    10 F.3d 46 (2d Cir. 1993) .....................................................................49, 50, 51

Lapsley v. Columbia Univ.-Coll. of Physicians and Surgeons,
    999 F. Supp. 506 (S.D.N.Y. 1998) .....................................................................29

Leibowitz v. Cornell Univ.,
 584 F.3d 487 (2d Cir. 2009) ............................................................................42

Leiman v. State of New York,
 No. 98 Civ. 5538, 2000 U.S. Dist. LEXIS 13586 (S.D.N.Y. Sept. 21,
 2000), aff'd, 9 F. App'x 37 (2d Cir. 2001) .........................................................53

Loughran v. Manhattan Life Ins. Co.,
 No. 84 Civ. 6157, 1987 WL 10385 (S.D.N.Y. Apr. 24, 1987) .........................34

Mattera v. JP Morgan Chase Corp.,
 740 F. Supp. 2d 561 (S.D.N.Y. 2010) ...............................................................43

McDonnell Douglas Corp. v. Green,
 411 U.S. 792 (1973)....................................................................15, 16, 43, 54

McDowell v. T-Mobile USA, Inc.,
 No. 04-2909, 2007 U.S. Dist. LEXIS 71591 (E.D.N.Y. Sept. 26, 2007),
 aff'd, 307 F. App'x 531 (2d Cir. 2009) ..............................................................41

McGuinness v. Lincoln Hall,
 263 F.3d 49 (2d Cir. 2001) ................................................................................21

Meiri v. Dacon,
 759 F.2d 989 (2d Cir. 1985) ..............................................................................16

Minor v. Bostwick Labs., Inc.,
 669 F.3d 428 (4th Cir. 2012) .............................................................................51

Mitchell v. Lyons Professional Servs., Inc.,
 708 F.3d 463 (2d Cir. 2013) ..............................................................................58

Moss v. Port Auth. of N.Y. & N.J.,
 No. 04 Civ. 9631, 2006 WL 3392693 (S.D.N.Y. Nov. 20, 2006).....................47

Norton v. Sam's Club,
 145 F.3d 114 (2d Cir. 1998) ..............................................................................18

O'Connell v. Consolidated Edison Co. of N.Y., Inc.,
 109 F. Supp. 2d 202 (S.D.N.Y. 2000) ...............................................................38

Ollman v. Special Bd. of Adjustment No. 1063,
 527 F.3d 239 (2d Cir. 2008) ..............................................................................11

Piazza v. Eckerd Corp.,
    No. 02-CV-0043E, 2003 WL 23350118 (W.D.N.Y. Aug. 22, 2003) ...............57

Pisana v. Merrill Lynch & Co., Inc.,
    No. 93 Civ. 4541, 1995 U.S. Dist. LEXIS 10296 (S.D.N.Y. July 20,
    1995) .....................................................................................................39

Portee v. Deutsche Bank,
    No. 03 Civ. 9380, 2006 U.S. Dist. LEXIS 9153 (S.D.N.Y. Mar. 7, 2006)........29

Primmer v. CBS Studios, Inc.,
    667 F. Supp. 2d 248 (S.D.N.Y. 2009) .................................................56

Pummell v. Commonwealth Home Fashions, Inc.,
    No. 02 Civ. 1171, 2005 WL 11727 (N.D.N.Y. Jan. 3, 2005)...........................33

Risco v. McHugh,
    868 F. Supp. 2d 75 (S.D.N.Y. 2012) ...................................................57

Rodriguez v. Schneider,
    No. 95 Civ. 4083, 1999 WL 459813 (S.D.N.Y. June 29, 1999), aff'd, 56
    F. App'x 27 (2d Cir. 2003))..................................................................55

Ross University School of Medicine, Ltd. v. Brooklyn-Queens Health Care,
    Inc.,
    No. 09–CV–1410, 2012 WL 6091570 (E.D.N.Y. Dec. 7, 2012) ......................57

Saenger v. Montefiore Med. Ctr.,
    706 F. Supp. 2d 494 (S.D.N.Y. 2010) .................................................18

Sarmiento v. Queens College CUNY,
    386 F. Supp. 2d 93 (E.D.N.Y. 2005), aff'd, 153 F. App'x 21 (2d Cir.
    2005) .....................................................................................................42

Schanfield v. Sojitz Corp. of Am.,
    663 F. Supp. 2d 305 (S.D.N.Y. 2009) .................................................29

Schnabel v. Abramson,
    232 F.3d 83 (2d Cir. 2000) .................................................................35

Sellick v. Agency-Castle Point,
    No. 09 Civ. 6616, 2010 WL 2813431 (S.D.N.Y. July 16, 2010) ......................17

Shumway v. United Parcel Serv., Inc.,
    118 F.3d 60 (2d Cir. 1997) ...............................................................54

Slattery v. Swiss Reinsurance Am. Corp.,
    248 F.3d 87 (2d Cir. 2001) ...............................................................36

Smith v. Pilgrim Power Elec. Contracting LLC,
    No. 09 Civ. 6130, 2011 WL 3962576 (S.D.N.Y. Sept. 6, 2011).......................57

Sommer v. PMEC Associates and Co. Ltd.,
    No. 88 Civ. 2537, 1992 WL 196748 (S.D.N.Y. Aug. 5, 1992)........................57

Terry v. Ashcroft,
    336 F.3d 128 (2d Cir. 2003) ........................................................16, 54

Timbie v. Eli Lilly & Co.,
    429 F. App'x 20 (2d Cir. 2011) ..........................................................32

U.S. Info Sys., Inc. v. Int'l Broth. of Elec. Workers Local Union No. 3,
    No. 00 Civ 4763, 2006 WL 2136249 (S.D.N.Y. Aug 1, 2006)........................55

Univ. of Tx. S.W. Med. Ctr. v. Nassar,
    2013 WL 3155234 (U.S. June 24, 2013) ............................................44

Vesprini v. Shaw Contract Flooring Servs., Inc.,
    315 F.3d 37 (1st Cir. 2002)..............................................................34

Vinokur v. Sovereign Bank,
    701 F. Supp. 2d 276 (E.D.N.Y. 2010) ................................................16

Wright v. Goord,
    554 F.3d 255 (2d Cir. 2009) ............................................................12

Zuffante v. Elderplan, Inc.,
    No. 02 Civ. 3250, 2004 WL 744858 (S.D.N.Y. Mar. 31, 2004) ....................19

**OTHER AUTHORITIES**

Local Civil Rule 56.1 ............................................ 1, 12, 55, 56, 57, 58, 59

Local Civil Rule 56.1(a) ........................................................55

Local Civil Rule 56.1(b) ........................................................55

Local Civil Rule 56.1(d) ................................................................55

Fed. R. Civ. P. 12(b)(6) ...............................................................10

Fed. R. Civ. P. 56 .......................................................................21

Fed. R. Civ. P. 56(e) ...................................................................12

x

## STATEMENT OF THE ISSUES

1.  Whether Judge Jones properly granted summary judgment where the undisputed evidence established that Deutsche Bank Securities Inc. ("DBSI" or the "Bank") terminated Daniel Graves's employment because the Media Group was overstaffed and top-heavy, and because Graves had the lowest rankings and revenues and the least seniority of any Managing Director in the Media Group. Standard of Review: *de novo*.

2.  Whether Judge Jones properly granted summary judgment where Graves failed to adduce sufficient evidence to establish that the termination of his employment and the denial of benefits to which he was not entitled was in retaliation for an alleged claim of age discrimination. Standard of Review: *de novo*.

3.  Whether Judge Jones abused her discretion in disregarding over 90 pages of Graves's additional argument and briefing in excess of what Local Rule 56.1 or her individual rules permitted. Standard of Review: abuse of discretion.

## STATEMENT OF THE CASE

On November 30, 2012, the Honorable Barbara S. Jones properly entered summary judgment for DBSI on all of the remaining claims asserted by Plaintiff Daniel Graves and denied Graves's partial motion for summary judgment.

The undisputed evidence establishes that DBSI terminated Graves's employment for the legitimate and non-discriminatory reason that he was the Managing Director with the lowest rankings and revenues in his group. In early 2004, the Media Investment Banking Group at DBSI, confronted with revenues that had been declining precipitously for several years and a top-heavy management structure, decided that one of its Managing Directors would be laid off. Jeffrey Amling, the head of the group, selected the candidate for termination. In consultation with his managers, Amling reluctantly selected Graves, who was then 41 years old and the second youngest Managing Director in the group. Amling selected Graves because he had had the lowest revenues for the group two years in a row, had been given the lowest or second-lowest ratings possible by a committee of his peers in every attribute on which he was rated, and had received the lowest overall ranking for the entire group.

In addition, Graves was the most-recently hired Managing Director in the group. Amling himself had hired Graves fewer than five years earlier, and less than a year before the layoff decision had spared Graves from a previous reduction in force ("RIF"). Amling did not select Graves's peer, Gregory Paul, who was then 46 years old. After his departure, Graves's remaining responsibilities were divided among the other bankers in the group, who ranged in age from eight years younger than Graves to several years older.

Graves has not disputed that he was the lowest ranked Managing Director in terms of revenue and ratings.  Instead, he claims that in 2002, only three years after he was hired, DBSI embarked on an intricate two-year plan to terminate him, all because he had turned 40 years of age, by shifting his accounts to younger bankers. He has not adduced a shred of credible evidence to support this fanciful theory.   In fact, far from supporting a claim of age discrimination, the unrebutted evidence positively negates any inference of discrimination.

Graves claims that when Amling informed him he was being laid off, he said that DBSI needed Graves's accounts for the "younger bankers."  This uncorroborated allegation is unworthy of credence because it appears nowhere in detailed contemporaneous notes Graves made of his conversation with Amling. Even if Amling had made the remark, however, Graves would still not have a claim – it is firmly established that where (as here) the decision maker is himself in the protected category and where (as here) the decision maker hired the plaintiff and where (as here) alleged comparators are close in age to the plaintiff, a single ambiguous remark such as Graves now alleges cannot serve as the foundation of a discrimination claim.

Graves also claims that DBSI discriminated and retaliated against him after informing him that he would be laid off because it did not reconsider its termination decision, permit him to stay on until he found another job, pay him a

3

bonus, or attempt to transfer him into another group. In fact, the undisputed evidence demonstrates that Graves's managers, including Amling, attempted to arrange for his transfer into another group. Graves has failed to adduce any evidence that he was treated differently than everyone else who was laid off with him: he has not identified a single individual who was laid off at the same time who was permitted to stay on at DBSI, and he has failed to identify a single one who received a bonus, as is consistent with DBSI's written policies.

Judge Jones had previously dismissed Graves's retaliation claim under the Fair Labor Standards Act ("FLSA") on March 18, 2010, and his FLSA retaliation claim fails for the same reasons that Judge Jones granted DBSI's motion for summary judgment and dismissed his retaliation claims under the Age Discrimination in Employment Act ("ADEA") and the New York City Human Rights Law ("NYCHRL"). Graves's retaliation claim under any theory cannot survive because he has failed to adduce any evidence that DBSI's reasons for his termination were pretextual, because his termination preceded his alleged internal complaints of discrimination, and because he has not pointed to any evidence that any of the employees selected for the January 2004 RIF were treated differently.

## STATEMENT OF FACTS

In March 1999, when Graves was 37 years old, Bankers Trust hired him into its Media Investment Banking Group, where he was supervised by Jeffrey Amling.

(A344 at ¶ 24; A587 at ¶ 24.)  In June 1999, Bankers Trust and Deutsche Bank merged.  Graves continued to report to Amling, and he was promoted to Managing Director ("MD") within a year of the merger.  (Id. at ¶ 25.)

When he was hired by Banker's Trust, Graves received an offer letter containing the initial terms of his employment.  (A710.)  In addition to setting forth Graves's annual compensation, the letter provided for a guaranteed minimum bonus for 1999 of $675,000.  (Id. ¶ 5.)  Other than this guarantee, Graves never received any writing from DBSI promising him a bonus for any particular year.  (A643 (Pl. Tr. 44:14-18).)  In fact, during the time Graves was employed by DBSI, the Bank issued Human Resources Policies governing aspects of his employment.  The Pay and Reimbursement procedure, in particular, set forth the terms under which incentive compensation, or bonuses, would be paid.  The policy provided: "To receive a bonus, you must be employed with Deutsche Bank on the day the bonus is paid out."  (A714.)

**Graves's Revenues and Rankings**

In 2002, Jacques Brand and James DeNaut became Co-Heads of Corporate Finance for the Americas at DBSI, and were given a mandate to grow revenues, profitability and market share for the industry sectors for which they were responsible, including the Media Group.  (A719, A721 (DeNaut Tr. 17:10-17 and 26:13-27:9).)  Market share or "wallet" for a particular client indicates the amount

5

of money the client customarily paid to investment banks during a specified period of time.  (A649 (Pl. Tr. 173:16-25).)  DBSI's share of that wallet was an indication of the effectiveness of the primary banker assigned to that client in the development of business.  (A728 (DeNaut Tr. 90:13-91:11); A733; A740; A758-A762.)  Brand and DeNaut concluded that the Media Group was underperforming and top-heavy, with MDs representing some clients who had not paid a transactional fee in over three years.  (A726 (84:14-22), A728 (90:13-91:11).)  Graves was one of those MDs.  (Id. 90:13-91:1)

In July 2003, DeNaut and Brand and other members of the Business Planning and Development Committee, or BPAD, met to formulate a plan for improving the performance of the Media Group.  (A731-A774.)  BPAD recognized that the Media Group had experienced one of the more severe fee declines over the past three years – 33% per year.  BPAD listed as open issues the fact that the Media Group was overstaffed, top heavy, and needed to consider the reassignment of underperforming accounts, including Gannett Corporation, to other bankers.  (A731-A733; A751.)  The materials BPAD reviewed as of January 2003 reflected that Graves was the MD with the lowest revenue for the period of 2001 to 2002 and the lowest market share.  (A756.)

Even before the BPAD report, Amling had met with Graves to advise him that his 2002 revenue was substantially below the target set for MDs and that,

6

should this trend continue in 2003, Graves's job might be in jeopardy.  (A800-A801 (116:4-117:10, 120:4-14).)  In fact, in May 2003, Amling was approached by senior management to clarify whether he intended to continue employing Graves and Gregory Paul, another MD who shared the broadcasting space with Graves.  (A815 (237:12-238:21); A816-A817.)  Amling, hoping that the revenue picture might appear brighter at the end of 2003, advocated retaining both bankers.  (Id.)

Graves's revenues continued to decline throughout 2003.  By December 2003, he had the lowest actual and projected revenue of any MD in the Media Group.  (A819-A826; SA4-SA16.)   Moreover, in a meeting of the Promotion and Performance Committee in November 2003, Graves had been ranked sixth of the seven Media MDs, had been rated last in the Corporate Finance MD ranking; had the second to lowest and lowest ratings for quality, quantity and culture, and had received the lowest rating in the overall regional ranking.  (SA9; A848-A849; A818-A824.)

Towards the end of 2003, given the continuing decline of investment banking revenues in the media industry, Amling and Brand discussed downsizing the Media Group, specifically eliminating either Graves's or Paul's position.  (A793 (Amling Tr. 81:3-82:18).)  Both Amling and Brand believed that the broadcasting sector, which formed a part of Graves's and Paul's client base, was no longer able to support two MDs.  (Id.)  Amling and Brand decided that Graves

7

would be laid off and his responsibilities divided among the remaining staff.
(A834 (Brand Tr. 36:9-22); A848-849; A818-A826; SA4-SA16.)  At the time of
this decision, Graves was 41 years old and Paul was 46.  (A854; A666 (Pl. Tr. 289:
2-8).)

Prior to communicating the decision to Graves, his supervisors inquired
whether it might be possible to transfer Graves to another group.  Specifically,
Amling, as well as Brand and DeNaut, approached Ben Griswold, the head of the
Large Cap Group, to see if there might be an opportunity for Graves there.  (A792
(Amling Tr. 79:10-80:18).)  That opportunity did not materialize, (id.; A856), and
Brand instructed Amling to communicate the termination decision to Graves.
(A855-A856.)

**Graves's Termination**

Amling met with Graves on January 14, 2004 to communicate the
termination decision.  Graves alleges that, at that meeting, Amling told him that,
among other reasons, he was selected for termination so that his accounts could be
given to the "younger bankers."  (A360 at ¶ 75.)  Amling categorically denies
having made this statement.  Significantly, this alleged comment is entirely absent
from contemporaneous notes that Graves made of this conversation.  (A614.)
DBSI terminated the employment of all of the employees whose positions were
selected for that reduction in force, including Graves's employment, effective

8

January 31, 2004.  (A857.)  Under the terms of the DBSI bonus policy, Graves did

not receive a bonus in 2004 because he was not actively employed on the date such

bonuses were paid out in February 2004.  (A713-A716.)

## PROCEDURAL HISTORY

The procedural history of this case dates back nine years.  In July 2004, six

months after he was laid off from DBSI, Graves filed a charge (the "Charge") with

the EEOC alleging age discrimination.  (A99.)  On November 5, 2004, DBSI

submitted its Position Statement in response to the Charge.  (A396.)  The EEOC

concluded that it could not determine that a violation of Graves's rights had

occurred, and issued him a Right to Sue Letter.  (A106.)

On June 8, 2007, Graves filed his Complaint alleging claims of age

discrimination and retaliation in violation of the ADEA and the NYCHRL, and

retaliation under the FLSA.  Graves also alleged common law causes of action

under theories of fraudulent concealment and breach of the covenant of good faith

and fair dealing.  Graves sought and obtained leave to file a First Amended

Complaint, and again obtained leave to file a Second Amended Complaint, which

he filed on April 3, 2009.  On April 22, 2009 DBSI moved for partial dismissal of

the Second Amended Complaint, and on March 18, 2010 Judge Jones dismissed

Graves's FLSA retaliation claim and common law claims for failure to state a

claim under Federal Rule of Civil Procedure 12(b)(6).  Graves has not appealed the dismissal of his common law claims.  (Appellee's Brief ("Br.") p. 12.)

Judge Jones also held that Graves's federal claims are limited to "the tangible injuries he suffered in 2004: his termination, the denial of continued employment …, and the January and February 2004 denial of his bonus for the work he performed in 2003."  (SPCL6-7.)  The Court further concluded that all other references to events occurring prior to 2004 would be considered only "relevant background evidence."  (Id.)

In discovery, DBSI produced over 80,000 pages of documents, and Graves took the depositions of five current and former DBSI personnel.  After filing the instant action, Graves returned to the EEOC and argued to it, as he does here, that DBSI had deliberately deceived the agency in its Position Statement.  In response, the EEOC invited the parties to submit written statements, and then conducted a day-long fact-finding conference at which Graves was provided with the opportunity to elaborate on his complaints and DBSI was allowed to present witnesses.  Following the fact-finding conference and a review of more than 600 pages of written submissions by both parties (A951 at ¶ 3), the EEOC concluded that it could not determine that DBSI had made any misrepresentations.  (A948.)

On May 24, 2012, DBSI moved for summary judgment and Graves filed his motion for partial summary judgment on the same day.  On July 9, 2012 the parties

submitted their opposition briefs.  In addition to his opposition brief, Graves

submitted a 133-page response to DBSI's five-page 56.1 statement, and included

over 90 pages of supplemental argument that did not refer or respond to DBSI's

statement of undisputed facts.  On July 19, 2012, Judge Jones granted Graves leave

to correct errors in his 56.1 statement.  On July 30, 2012 the parties submitted their

reply briefs.  On September 19, 2012, Graves requested leave to file a

supplemental brief to respond to an argument that he had "inadvertently left

unanswered" in his opposition to DBSI's motion for summary judgment; Judge

Jones granted Plaintiff's request on September 25, 2012.  DBSI submitted its

supplemental reply brief in response to Plaintiff's supplemental opposition brief on

October 5, 2012.

On November 30, 2012, Judge Jones granted DBSI's motion for summary

judgment in its entirety and denied Graves's partial motion for summary judgment.

Graves appealed.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*

and applies the same standard as the district court, affirming only if the record,

viewed in the light most favorable to the non-moving party, reveals no genuine

issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48

(1986); Ollman v. Special Bd. of Adjustment No. 1063, 527 F.3d 239, 245 (2d Cir.

2008).  The opposing party must "set out specific facts showing a genuine issue for

trial," and cannot "rely merely on allegations or denials" contained in the

pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d

Cir. 2009).

In a discrimination case, summary judgment is appropriate where the

plaintiff relies on conclusory allegations of discrimination and the employer

provides a legitimate rationale for its conduct.  Holcomb v. Iona Coll., 521 F. 3d

130, 137 (2d Cir. 2008) (even in employment discrimination cases, "a plaintiff

must provide more than conclusory allegations to resist a motion for summary

judgment.").  "An opposing party's facts must be material and of a substantial

nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences,

conjectural, speculative, nor merely suspicions."  Isaac v. City of N.Y., 701 F.

Supp. 2d 477, 486 (S.D.N.Y. 2010) (citing Contemporary Mission, Inc. v. U.S.

Postal Serv., 648 F.2d 97, 107 n.14 (2d Cir. 1981)).

This Court reviews a district court's refusal to consider portions of a Rule

56.1 counterstatement that violate the local rules or a judge's individual rules for

abuse of discretion.  See Abreu v. New York City Police Dept., 329 F. App'x 296,

299 (2d Cir. 2009).

## SUMMARY OF ARGUMENT

As the abundant evidence adduced by DBSI establishes, DBSI terminated Graves's employment for the legitimate, non-discriminatory reason that the Media Group was overstaffed and top-heavy, and that Graves was the lowest to second lowest ranked and rated MD in the Media Group, and had the lowest actual and projected revenues among his peers.  Graves has not pointed to any evidence sufficient to create a disputed issue of material fact that age-based animus was either a "but for" cause or a "motivating factor" in DBSI's termination decision. Graves's efforts to complicate and obscure the reasons for his termination with irrelevant evidence, cherry-picked comparators, and his self-serving opinion of his own performance and value to DBSI are unavailing.  Nor can Graves's retaliation claim under any theory survive summary judgment in the face of undisputed evidence that DBSI's employment decisions preceded any allegation of protected activity, were motivated by legitimate, non-discriminatory reasons, and that no similarly-situated employees were treated differently.  Judge Jones properly entered summary judgment for DBSI on Graves's discrimination and retaliation claims and this Court should affirm.

13

# **ARGUMENT**

## **I.    THE UNDISPUTED EVIDENCE ESTABLISHES NO AGE DISCRIMINATION.**

Other than Graves's claim that Amling supposedly referred to giving Graves's accounts to "younger bankers" during his termination meeting, Graves has adduced absolutely no evidence to support his theory of a two-year conspiracy that was allegedly hatched in 2002, the year he turned 40 years old, to fire him and re-allocate his accounts to other bankers.  (A347 at ¶ 32.)  Graves's selection for the January 2004 RIF and the decisions taken with respect to the terms of his termination were based on legitimate business considerations that stand unrefuted by Graves.  Moreover, Graves has failed to set forth any evidence that an offer of continued employment for a period of time, or, as characterized by Graves, a "soft landing," was a "customary" practice at DBSI.  Finally, DBSI's purported decision not to pay Graves a performance bonus in 2004 is supported by the express terms of DBSI's compensation policy that provide that, in order to receive a bonus, an employee must be employed by DBSI on the date that it is paid.  Graves was not employed on that date and, therefore, he did not receive a bonus.  (See Br. 18, 20 stating that Graves's last day of employment was January 31, 2004 and that the Bonus Payout date was in February 2004.)

In Gross v. FBL Fin. Serv. Inc., 557 U.S. 167 (2009), the Supreme Court held that "the ordinary meaning of the ADEA's requirement that an employer took

adverse action 'because of' age is that age was the 'reason' that the employer decided to act." Id. at 176.  Thus, "[t]o establish a disparate-treatment claim under the plain language of the ADEA, . . . a plaintiff must prove that age was the 'but for' cause of the of the employer's adverse decision." Id.  Although the Supreme Court noted that it "has not definitively decided whether the evidentiary framework of [McDonnell Douglas] . . . is appropriate in the ADEA context", id. at 175 n.2, New York courts have continued to apply a modified version of the McDonnell Douglas burden-shifting framework to cases brought under the ADEA.  See Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010).

A plaintiff bringing a case under the ADEA must first establish a *prima facie* claim of discrimination by showing that:  (1) he was within the protected age group; (2) he was qualified for the position; (3) he experienced an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of employment discrimination.  Id. at 107.  If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to "articulate some legitimate nondiscriminatory reason for [the adverse act]." Id. at 106.  After the defendant satisfies the requirement, the burden then shifts to the plaintiff to present evidence that the defendant's proffered explanation is pretextual and that age was the "but for" cause of the challenged adverse employment action. Id. at 106; Holowecki v. Federal Express Corp., 382 F. App'x 42 (2d Cir. 2010).

Under the NYCHRL analysis, once the defendant meets its burden of
articulating a legitimate business reason for the challenged decision, the
presumption of discrimination "drops out of the picture" and the burden shifts back
to the plaintiff to present sufficient evidence to permit a rational finder of fact to
infer that the defendant's proffered reason is a pretext and that the defendant's
employment decision is more likely than not based in whole or in part on
discrimination.  Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003); Vinokur v.
Sovereign Bank, 701 F. Supp. 2d 276, 287 (E.D.N.Y. 2010).  "The burden of
establishing pretext is a higher burden than that required to establish the *prima
facie* case, and the Second Circuit has instructed that plaintiffs' 'initially vague
allegation of discrimination' must be 'increasingly sharpened and focused' at this
stage."  Isaac, 701 F. Supp. at 488 (citing Meiri v. Dacon, 759 F.2d 989, 995 (2d
Cir. 1985)).

Even under the more independent and liberal standard accorded the
NYCHRL by the Restoration Act of 2005, N.Y.C. Local Law No. 85 (Oct. 3,
2005), a plaintiff must rebut defendant's showing at the third step of the
McDonnell Douglas analysis by showing that age was a "motivating factor" for the
adverse employment action.  Colon v. Trump Int'l Hotel & Tower, No. 10-Civ.-
4794, 2011 WL 6092299, at *5 (S.D.N.Y. Dec. 7, 2011).  Nothing in the 2005
revisions to the NYCHRL, however, changed the standard for establishing a

disputed issue of material fact.  Baguer v Spanish Broadcasting Sys., No. 04 Civ.

8393, 2010 WL 2813632, at *16 (S.D.N.Y. July 12, 2010), aff'd, 423 F. App'x 102

(2d Cir. 2011) .  Even under the "motivating factor" standard, "the NYCHRL does

not alter the 'kind, quality or nature of evidence that is necessary to support or

defeat a motion for summary judgment.'"  Julius v. Dep't of Human Res. Admin.,

No. 08 Civ. 3091, 2010 WL 1253163, at *5 (S.D.N.Y. Mar. 24, 2010).

Under either standard, Graves cannot establish that age played any role in

the decision to terminate his employment.  Graves has pointed to no direct

evidence of discrimination and has failed to point to any facts that would allow a

reasonable juror to find that DBSI's explanations are pretextual or that age was a

but-for cause of, or even a motivating factor for, his termination.  Judge Jones

properly granted DBSI's motion for summary judgment because DBSI has

articulated a legitimate business reason for his termination that Graves cannot rebut

with the meager evidence he has adduced in this case.

**A.    DBSI Has Established Legitimate Business Reasons for The
        Employment Decisions Made Regarding Graves.**

"'It is not the role of federal courts to review the correctness of employment

decisions or the processes by which those decisions are made.'"  Sellick v.

Agency-Castle Point, No. 09 Civ. 6616, 2010 WL 2813431, at *10 (S.D.N.Y. July

16, 2010).  See also Kaplan v. Beth Israel Med. Ctr., No. 07 Civ. 8842, 2010 WL

1253967, at *6 (S.D.N.Y. Mar. 31, 2010).  Moreover, "the ADEA does not make

employers liable for doing stupid or even wicked things; it makes them liable for discriminating, for firing people on account of their age." Saenger v. Montefiore Med. Ctr., 706 F. Supp. 2d 494, 509 (S.D.N.Y. 2010) (quoting Norton v. Sam's Club, 145 F.3d 114, 120 (2d Cir. 1998)).  DBSI's legitimate business reasons for selecting Graves for the RIF, for not providing him with a "soft landing," and for not paying him a 2004 bonus are set forth in numerous undisputed documents and in unchallenged deposition testimony.

> ### 1.   Graves Was Selected for the RIF Because He was the Lowest Performing Managing Director.

Graves cannot rebut the well-documented and undisputed fact that there was a downward trend in the media sector in 2003 and 2004, nor can he argue with DBSI's assessment that the Media Group was top-heavy.  (A732; A804, A815 (Amling Tr. 133:1-6 and 238:5-21).)  Graves also cannot dispute that he was the MD with the lowest actual revenue for 2001-2002 and the lowest projected revenues for 2003 and 2004.  (A819-A826; SA4-SA16; A848-A849.) Approximately nine months prior to his termination, Amling had advised Graves that his revenues were materially below the level required for MDs and that he should be aware of the likelihood of termination if the downward trend continued. (A800-A801 (Amling Tr. 116:4-117:10, 120:4-14).)  DBSI, therefore, has articulated a legitimate business reason for the selection of Graves's position for the January 2004 RIF.

Although Graves might disagree as to his value to the Media Group, or suggest that this Court should look to his self-serving characterization of his own performance, he cannot prove that he satisfied DBSI's "honestly held expectations" relating to his revenues and rankings.  Holt v. KMI-Cont'l, Inc., 95 F.3d 123, 129-30 (2d Cir. 1996) (plaintiff's personal belief that she was qualified for a position is insufficient to demonstrate that an adverse action was discriminatory); Zuffante v. Elderplan, Inc., No. 02 Civ. 3250, 2004 WL 744858, at *6 (S.D.N.Y. Mar. 31, 2004) (granting summary judgment where the plaintiff failed to present evidence that he adequately performed his responsibilities, other than his disagreement with his employer's judgment regarding his qualification).

It is undisputed that Graves was the lowest performing MD in his group. Graves does not refute that he was ranked fifth of the six MDs in the Media Group,[1] and that he was ranked C for Quality and Quantity, and D for Culture, which were the lowest or second lowest rankings one could receive.  (SA523-524, at ¶¶ 2, 4.)  It is undisputed that Graves was ranked last in the Corporate Finance MD ranking.  (Id. at ¶ 3; A819-A826.)  In addition, Graves had the lowest actual and projected revenues among MDs in his group.  (A819-A826; SA4-SA16; A848-

---

[1] Graves alleges that Amling elevated Paul in the rankings of Media Group MDs (from sixth to third) in anticipation of Graves's termination (Br. 24), but that is of no moment.  Given that Paul is older than Graves, that allegation, if true, would only undermine any inference of discrimination, and Graves does not dispute that he was ranked fifth of the six MDs in the Media Group regardless of whether Paul was ranked third or sixth.

19

A849.)  Graves concedes that he was the MD with the lowest revenue and the

lowest market share for the 2001-2002 period.  In his response to DBSI's Rule

56.1 Statement 8, Graves admits that Amling, Charles Carey, Malcolm Morris and

Paul – the other MDs in the group – had higher 2001-2002 revenues (SA514 at ¶¶

2-3), and higher market shares.  (SA515, at ¶¶ 4-5.)

Graves purports to dispute the relevance of his declining revenues on the

basis that Dyan Triffo had lower revenue figures, but this was a function solely of

Triffo's maternity leave, which began in October 2002, as Graves acknowledges.

(SA551.)  Graves does not dispute that his revenues were the lowest of any MD in

the group.  Instead, he offers a self-serving characterization of his own revenue

relative to his own target, not relative to his peers, and can only muster the

assertion that if his revenues for December 2002 are considered "in isolation" then

he would have had higher revenues than other Managing Directors.  (Br. 22.)

Graves attempts to distract from the relevant, undisputed facts by suggesting

that the Court should compare his revenues and rankings not only to other MDs,

but also to Directors, based on his conclusory statements that MDs and Directors

received similar compensation and performed similar duties.  (Br. 20, 48.)

Graves's self-serving comparison of his own performance to his cherry-picked,

purported comparators – who were Directors and not MDs – is a non sequitur.

Holowecki, 382 F. App'x 42 (affirming finding that younger comparators that

20

plaintiff selected were cherry-picked, and granting summary judgment).  Graves

does not explain what duties MDs and Directors actually performed, and merely

suggests, without any developed argument, that this Court should figure out for

itself what he means by studying six individuals' 2003 year-end performance

evaluations.  (Br. 20.)  It is not this Court's job to sift through the record and

determine whether it contains any relevant facts or to make Appellant's argument

for him.  "Fed. R. Civ. P. 56 does not impose an obligation [on the court

considering a motion for summary judgment] to perform an independent review of

the record to find proof of a factual dispute."  Amnesty Am. v. Town of West

Hartford, 288 F.3d 467, 470 (2d Cir. 2002).

 Graves fails to explain, much less cite any evidence in the record, why the

employment characteristics of his cherry-picked comparators were similarly

situated to his own in all material respects.  Examples of what constitutes a

"material respect" are holding the same positions of roughly the same rank, and

being subject to the same performance review and disciplinary standards.  Graham

v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000).  "[W]here a plaintiff seeks to

make out [his] prima facie case by pointing to the disparate treatment of a

purportedly similarly situated employee, the plaintiff must show that she shared

sufficient employment characteristics with that comparator so that they could be

considered similarly situated."  McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d

21

Cir. 2001). Even the evidence Graves points to makes clear that Managing

Directors supervised and evaluated Directors and were more senior than Directors.

(See, e.g., SA244 and 250 showing that Carey, an MD, completed the 2003

performance evaluations of Faulstich and Dunn, who were both Directors.) Graves

presents only the generic conclusion that MDs and Directors received "closely

similar" compensation (Br. 21) and had the same revenue target. (Br. 20.) He fails

to provide any competent evidence that the compensation of MDs and Directors

was, in fact, similar, that their revenue targets were the same, or that as a legal

matter "similarity" in compensation or revenue targets suffices to make a Director

an appropriate comparator to a MD. The evidence that Graves points to in support

of his statement that MDs and Directors received similar compensation (Br. 21),

actually undermines his assertion and shows that Managing Directors generally

earned hundreds of thousands of dollars more than Directors. With respect to

revenue targets, Graves points only to his own deposition testimony stating his

belief that they were the same (Br. 20), but provides no evidence to corroborate his

belief. "[Plaintiff's] conclusory statements and subjective feelings — not facts —

in support of her claims that she was treated differently because of her gender . . .

cannot withstand a properly supported motion for summary judgment." Gross v.

N.B.C., Inc., 232 F. Supp. 2d 58, 72 (S.D.N.Y. 2002).

22

Graves also essentially concedes that his revenues continued to decline throughout 2003 and that he continued to have the lowest actual and projected revenue of any MD in the media group.  (SA521-522.)  He points to an October 2003 Business Planning document to argue that compared to other MDs and Directors, he had the fourth or fifth highest revenues in the group, higher than Amling and Triffo.  (Br. 22.)  Graves has already conceded that he had the lowest revenues and market share of any MD in the Media Group for 2001-2002.  (See SA514 at ¶¶ 2-3; SA515, at ¶¶ 4-5.)  The document that he references (see Br. 22 (citing SA389)) actually shows that for 2002-2003, Graves had the lowest revenues of any MD besides Amling, who as the group head and Graves's supervisor had additional administrative duties and is not a direct comparator, and Triffo, who was on maternity leave.  However, the document set forth at SA388-389 is from October 2003, while the document set forth at (SA4-SA16), and which Judge Jones referenced in her opinion (SPCL35-36), is from later in that year and shows that Graves had the lowest actual and projected revenue of any MD in his group for 2003.  (See also A756; A818-826.)  Graves has not refuted the import of these figures in DBSI's termination decision.

## 2.    DBSI Did Not "Set Graves Up to Fail" by Transferring Graves's Accounts to Younger Bankers

Graves suggests that this Court should ignore the undisputed facts regarding his low rankings, ratings, and revenues based on the allegation, for which he has

not adduced a scintilla of evidence, that DBSI engaged in a multi-year conspiracy, starting when Graves just turned 40, to transfer his accounts to other bankers. This argument is without merit. *First*, accounts were transferred from Graves, as they were from other bankers, but during the same period accounts were transferred to Graves. (A954-A955.) *Second*, the Adelphia and Charter accounts, about which Graves complains (Br. 25-26), were not "taken away" from Graves. Instead, Graves stopped calling on both of those accounts after members of Charter's senior management resigned in connection with an SEC investigation, and members of Adelphia's senior management were arrested and charged with fraud. (SuppAppx1-2 (182:16-183:17, 185:12-186:1); SA93 (Graves noting that Charter's "former executives were indicted for fraud").) *Third*, the transferred accounts generated little or no revenue for DBSI in 2003 as a result of the resignations, arrests, and criminal investigations at those entities. (SA122-123; SA126-127.)

The undisputed evidence shows that the Adelphia account was transferred to Triffo because she had a business contact who was on the restructuring team at Adelphia after its bankruptcy, while Graves's business relationship was with Adelphia personnel who were arrested and charged with fraud. (SuppAppx1-2.) Graves's characterization of the revenues DBSI earned from Adelphia and Charter is irrelevant. (See Br. 28-29.) The document Graves cites (see SA123) to argue that Adelphia and Charter were high-revenue accounts for DBSI actually reflects

that in 2003, when the account was transferred, Adelphia had a credit rating of

"D", a market share of 0.0%, and that DBSI had collected zero revenue from

Adelphia following its bankruptcy and the arrest of its senior management. As the

document reflects on its face, the revenues shown are for the entire 2001-2003

period as paid to all banks, not to DBSI.

Graves suggests that Charter was a valuable account, and that DBSI set him

up to fail and miss his revenue targets by transferring the account from him to Sun

Yung. (Br. 29.) It is undisputed that members of Charter's senior management

were indicted for accounting fraud in 2002, and that DBSI is listed as having 0% of

Charter's "wallet" for 2003. (SA122-123; SA126-127.) Graves makes similar

arguments with respect to Cox Communications and Cox Enterprises, but it is

undisputed that Graves was the Senior Investment Banker ("SIB") on these

accounts only from March to May 2003. (A954-A955.) Like Adelphia and

Charter, the revenue numbers for the entire 2001-2003 period Graves references

for Cox represent fees earned by all financial institutions, not just DBSI.

Graves also complains that he was not made the SIB on Gannett. (Br. 36.)

But the undisputed evidence shows that Gannett generated no revenue for DBSI

during the relevant period. (SuppAppx3 (189:13-192:9); SA122-SA123; SA126-

127.) Whether Graves was named SIB on Gannett was irrelevant to his revenues

and rankings.  Indeed, had he been named SIB on a zero-revenue account, he would now surely point to this as "evidence" of discrimination.

Despite Graves's efforts to inflate the value to DBSI of the Adelphia, Charter, Cox, and Gannett accounts and to aggrandize his role with respect to these accounts, they produced little to no revenue for DBSI when they were transferred. As a result, Graves's argument that these accounts were transferred from him to lower his revenue figures so that DBSI could terminate his employment (an argument for which Graves offers plenty of conjecture but no evidence) is entirely meritless.

### 3. Graves Was Not Offered a "Soft Landing" as That Was Not a Customary Benefit.

Graves complains that DBSI refused to give him a six month period of time in which to find another position.  (Br. 16; A363 at ¶ 87.)  Graves has adduced no evidence that such a concession was customarily made for terminated employees. The undisputed evidence, in fact, demonstrates the opposite.  First, Graves has failed to adduce any evidence that any employee who was selected for termination in the January 2004 RIF received a "soft landing."  (SuppAppx4-7.)  Second, the undisputed record shows that other than those employees who had a pending transaction that needed to be either completed or transitioned, no MD was retained for a time period after the date of termination.  (Id.; A835 (Brand Tr. 39: 1-8).)  Lastly, Graves's supervisors, Amling, Brand and DeNaut, uniformly testified that

26

providing employees with a period of time beyond their termination to look for another job was neither standard or customary.  (A806 (Amling Tr. 145:20-146:5); A729 (DeNaut Tr. 108:6-21); A835 (Brand Tr. 40:5-15).)  DeNaut specifically testified that the only time an MD would be asked to stay on as a consultant beyond his or her termination date – a situation that occurred in less than 5% of all terminations – would be where there was a legitimate business reason.  (A730 (110:1-9).)  As Graves was terminated precisely because of his lack of transaction prospects, that business reason did not exist for him.

Finally, Graves argues that DBSI discriminated and retaliated against him by refusing to provide him with more than 15 weeks of severance.  (Br. 16, 54.)  But the document he cites (see A850-51, and see SuppAppx4-5 for more legible copy) actually shows that an employee's tenure with the bank determined the amount of severance, and that the two employees who received 33 and 36 weeks of severance had been with DBSI for 11 and 12 years respectively, versus Graves's five years of employment.  The evidence shows that other employees received less severance than Graves and that the amount of severance was determined based on a legitimate nondiscriminatory reason – the length of an employee's service to the Bank.

### 4.    Graves Was Considered for a Transfer.

Graves's contention that DBSI owed him an obligation to seek a transfer within the Bank is based on nothing more than his own conjecture, and he has adduced no evidence that any similarly situated personnel were offered such opportunities in connection with the January 2004 RIF.  Graves offers the conclusory statement that Chang was offered a transfer (Br. 45), but points to no evidence that she was included in the January 2004 RIF or that she was an appropriate comparator (Chang was a Director, not an MD).  In fact, Graves states elsewhere in his brief that "DBSI did not fire Elizabeth Chang in 2004…" (Br. 19), and that "there is no evidence that anyone else in the Media Group was terminated at the time of Graves's termination."  (Br. 15.)  Nonetheless, despite having no obligation to do so, after learning that Graves might be included in the January 2004 RIF, Amling contacted Ben Griswold, the Head of the Large Cap Coverage Group, to see if there were any positions into which Graves could transfer.  (A792 (Amling Tr. 79:10-80:4).)  Rather than suggesting discriminatory intent, Amling's unsolicited attempt to try to find another place for Graves at DBSI is yet another factor actually negating any discriminatory animus in the decision to select Graves for termination.

### 5. Graves Was Not Paid a Bonus Because He Was Not Eligible to Receive One Under DBSI's Consistently Applied Compensation Policy.

Graves claims that, as a result of his age, he was not given a bonus in 2004 for his work in 2003.  The undisputed documents and testimony, including Graves's own admissions, establish that the DBSI bonus policy contained a provision that an employee who was not actively employed on the date the bonuses were paid out would not be eligible to receive a bonus for that year.  (A643 (Pl. Tr. 42:13-43:4); A713.)  The fact that the Bank did not pay Graves a bonus for which he was not eligible, together with the fact that he has not adduced any evidence suggesting that any similarly situated person received a bonus, cannot form the basis for a claim of age discrimination as a matter of law.  "Drawing an inference of . . . discrimination from the award of a discretionary bonus requires that such an award differ meaningfully from those awarded to other, similarly situated individuals."  Portee v. Deutsche Bank, No. 03 Civ. 9380, 2006 U.S. Dist. LEXIS 9153, at *21-22 (S.D.N.Y. Mar. 7, 2006); Schanfield v. Sojitz Corp. of Am., 663 F. Supp. 2d 305, 338 (S.D.N.Y. 2009) (dismissing discrimination claim where plaintiff did not establish entitlement to bonus and did not establish that any similarly situated employee received a bonus); Lapsley v. Columbia Univ.-Coll. of Physicians and Surgeons, 999 F. Supp. 506, 519 (S.D.N.Y. 1998).

Instead of attempting to distinguish well-established law that forecloses his claim, Graves offers another non-sequitur. He cites to a handful of arbitration decisions where the claimant was awarded damages for unspecified reasons. (Br. 11, 18, 19.) These decisions say nothing about DBSI's bonus policy, the law and evidence the arbitrators considered, or the propriety of DBSI's policy. By contrast, numerous reported court decisions have specifically upheld DBSI's policy not to pay bonuses to employees who are not actively employed on the payout date. See, e.g., Hunter v. Deutsche Bank AG, 56 A.D.3d 274, 866 N.Y.S.2d 670 (1st Dep't 2008); DeSantis v. Deutsche Bank Trust Co. Am., Inc., 501 F. Supp. 2d 593, 601 (S.D.N.Y. 2007). As Judge Jones correctly held, Graves's self-serving characterization of arbitration decisions is insufficient to "provide relief contradicting the express terms of the employment agreement." (SPCL41.) This is particularly true given Graves's acknowledgement that "there is no evidence that anyone else in the Media Group was terminated at the time of Graves's termination" (Br. 15). Graves cannot point to any evidence that any similarly-situated employees outside his protected group were terminated at the same time and received a bonus.

**B.    Graves Has Failed to Adduce Any Evidence to Prove DBSI's Articulated Reasons Were Pretextual or That Age Had Anything To Do With the Employment Decisions Relating to Graves.**

Once DBSI has articulated a legitimate non-discriminatory reason for terminating his employment, the burden of proof shifts to Graves to set forth sufficient evidence to prove that age was the "but for" reason or a motivating factor, for DBSI's actions.  <u>Gross</u>, 557 U.S. at 167.

**1.    Amling's Purported Comment Is Inconclusive**

The sole evidence Graves proffers in support of his claim of age discrimination consists of a single statement purportedly made by Amling that he needed Graves's clients for the "younger bankers."  (A340 at ¶ 11; A360 at ¶ 75.) Other than this single statement, Graves cobbles together extraneous and unsupported allegations that have absolutely no connection to his age and which cannot support even the slimmest inference of discrimination under any standard.

As an initial matter, Amling's comment is unworthy of credence due to the fact that it appears nowhere in contemporaneous notes Graves made of his conversation with Amling, although he recorded every other material statement allegedly made by Amling at the meeting.  (A614.)

This Court has repeatedly held that remarks directly related to age, even if made by a supervisor, are insufficient standing alone to evince discriminatory animus.  <u>See</u>, <u>e.g.</u>, <u>Fried v. LVI Servs., Inc.</u>, 500 F. App'x 39, 41 (2d Cir. 2012)

31

(concluding that age-related comment to plaintiff by CEO of defendant company

six weeks before plaintiff's termination was insufficient to permit reasonable jury

to conclude that "'but for' defendants' age bias, [plaintiff] would not have been

terminated[,]" considering "overwhelming documentary evidence" supporting

defendants' nondiscriminatory explanation); Iuorno v. DuPont Pharms. Co., 129 F.

App'x 637, 642 (2d Cir. 2005) (a supervisor's "stray remark" that the plaintiff was

old enough to be a younger employee's "mother" was "insufficient to support an

inference of age discrimination"); see also  Gioia v. Forbes Media LLC, 501 F.

App'x 52, 55 (2d Cir. 2012) ("'stray remarks, even if made by a decisionmaker, do

not constitute sufficient evidence to make out a case of employment

discrimination.'") (citations omitted).  In Timbie v. Eli Lilly & Co., this Court

affirmed a grant of summary judgment and found that a single, facially age-related

comment is "insufficient to allow [plaintiff] to carry her burden in showing that

age-discrimination was the 'but-for' cause").  429 F. App'x 20, 24 (2d Cir. 2011).

Even under the NYCHRL, Graves's allegation of a single statement by Amling

referring to "younger bankers" is insufficient as a matter of law to prove that the

decisions taken with respect to Graves's termination were discriminatory.  See

Dixon v. Int'l Fed. of Accountants, 416 F. App'x 107, 110 (2d Cir. 2011)

(upholding grant of summary judgment under NYCHRL where a plaintiff's "entire

employment discrimination claim [was] predicated on an isolated derogatory

32

remark"); Crawford v. Dep't of Investigation, 324 F. App'x 139, 142 (2d Cir. 2009) (dismissing age discrimination claim under the NYCHRL where the sole evidence was statements that the plaintiff was "too old" for Peace Officer training); Campbell v. Alliance Nat'l Inc., 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) (finding isolated, stray remark insufficient to establish animus under "motivating factor" standard); Pummell v. Commonwealth Home Fashions, Inc., No. 02 Civ. 1171, 2005 WL 11727, at *5 (N.D.N.Y. Jan. 3, 2005) ("[A]s a general rule, a single stray comment such as this is insufficient to establish that age was a motivating factor.").

When a plaintiff's case hinges entirely on a stray comment, even when made by a decision maker, courts are careful to evaluate the context in which the statement was made.  See Gioia v. Forbes Media LLC, No. 09 Civ 6114, 2011 WL 4549607, at *9 (S.D.N.Y. Sept. 30, 2011) (considering claims of discrimination and retaliation under the NYCHRL and explaining that "[i]n determining whether a comment is a probative statement that evidences an intent to discriminate or whether it is a non-probative stray remark, courts…consider…the context in which the remark was made[.]"), aff'd, 501 F. App'x 52 (2d Cir. 2012); Fried, 500 F. App'x at 41 ("we consider the totality of the evidence that [plaintiff] points to as evidence of defendants' age bias" when considering alleged stray remark).  Courts have found that the use of the word "young" is not always indicative of age bias,

especially in circumstances such as those here, where the individual who made the statement was older than the plaintiff and had been previously supportive of the plaintiff.  See Kearney v. ABN AMRO, Inc., 738 F. Supp. 2d 419, 430-31 (S.D.N.Y. 2010) (considering NYCHRL age and sex discrimination claim and holding that single age-related comment by supervisor not sufficient proof to show age discrimination where comment made by individual who had previously taken steps to protect the plaintiff's job); Beshty v. General Motors, 327 F. Supp. 2d 208, 218 (W.D.N.Y. 2004) (rejecting the plaintiff's position that any reference to age is automatically evidence of discriminatory animus); Loughran v. Manhattan Life Ins. Co., No. 84 Civ. 6157, 1987 WL 10385, at *6 (S.D.N.Y. Apr. 24, 1987) (finding statement that people being hired were coming in at "young ages" to be a truism and not indicative of a discriminatory purpose).  See also Vesprini v. Shaw Contract Flooring Servs., Inc., 315 F.3d 37, 42 (1st Cir. 2002) (holding that comments made by supervisor regarding making way for "young[er]" employees did not create an inference of age bias); Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 512 (4th Cir. 1994) (same).

Here, the reference to "younger bankers" (even assuming it was made) on its face would not refer to the selection of 41-year-old Graves to be terminated because of his age but rather to the Bank's alleged decision to give accounts to the group of bankers who had just been promoted to Director.  Nothing about this

statement suggests anything more than a desire to provide accounts to more *junior* bankers, and the interpretation urged by Graves that Amling meant bankers who are younger in age is strained to say the least in light of the fact, which Graves does not refute, that one of the Directors in the Media group was, like Graves himself, 41 years old.  (<u>See</u> Br. 20 acknowledging that Ellen Silver was 41 years old at the time of Graves's termination.)

The import of Graves's single piece of "evidence" is further undermined by the fact that Amling, who was 50 years old at the date of Graves's termination, had hired him fewer than five years earlier.  (A344 at ¶ 24; A710; A854.)  It is axiomatic that "[w]hen the same person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation that would be consistent with the decision to hire."  <u>Kaplan</u>, 2010 WL 1253967, at *5 (granting defendant's summary judgment motion and dismissing ADEA claim) (quoting <u>Grady v. Affiliated Cent. Inc.</u>, 130 F.3d 553, 560 (2d Cir. 1997)); <u>Schnabel v. Abramson</u>, 232 F.3d 83, 91 (2d Cir. 2000) (fact that same actor hired and terminated plaintiff is "a highly relevant factor"); <u>Emanuel v. Oliver, Wyman & Co. LLC</u>, 85 F. Supp. 2d 321, 332 (S.D.N.Y. 2000) ("When the same actor makes both the decision to hire the plaintiff and the decision to fire the plaintiff, the defendant is entitled to a strong inference that there was no discriminatory intent on the part of the employer).

The inference of non-discrimination is further strengthened by the fact that Amling was older than Graves and in the same protected age category at the time of Graves's termination. The fact that the decision maker is a member of Graves's protected class not only weakens any suggestion of discrimination but "strongly suggest[s] that invidious discrimination is unlikely . . . ." Grady, 130 F.3d at 560 (affirming summary judgment for defendant on ADEA age discrimination claim); Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 94 (2d Cir. 2001) (affirming grant of summary judgment for defendant on ADEA age discrimination claim even in light of potentially discriminatory comment due, in part, to the fact that the plaintiff's supervisors were also in an age-protected category).

Graves also refers to a statement by DeNaut regarding changes among "senior personnel" (Br. 10), as evidence of age-based animus. As Judge Jones properly held, DeNaut's statement indicates nothing of the sort. (SPCL37 at n.7.) DeNaut testified that he "changed out the senior personnel in most of the groups . . . ." (A721 (27:1-28:11).) Plaintiff argues that there are only two possible inferences to be drawn from this testimony, namely that by "senior" personnel DeNaut meant either those who had been employed longest or that he meant "older employees," and then assumes that it must be the latter. Graves overlooks the most obvious interpretation. It is clear from DeNaut's testimony that by "senior personnel", he meant the "leadership" of several groups referred to in the prior

36

passage, and, in fact, DeNaut used that terminology just before his reference to "senior personnel", testifying that he and Brand "changed out the leadership of the majority of the groups."  (Id.)  The only reasonable inference to be drawn from DeNaut's testimony is that he meant upper-level managers of groups were being changed out, not that DBSI intended to fire older employees.

Even if DeNaut meant "older" when he said "senior," and even if Amling did make a comment about "younger bankers", which he did not, these statements do not, individually or collectively, constitute evidence of discriminatory animus, Gioia, 501 F. App'x at 55, and Graves cannot defeat summary judgment based on these comments given the abundant undisputed evidence that negates any inference of discrimination.

### 2. Graves Was Not Materially Older Than The Purported "Younger Bankers"

Any inference of discrimination in the decision to terminate Graves's employment for the sake of "younger bankers" who had just been promoted to Director is further undermined by the fact that the youngest of these "younger bankers" to whom Graves points was only eight years younger than Graves at the time of his termination.  Significantly, other Directors in the group ranged in age up to 41 – Graves's own age when he was terminated.  Courts in this and other circuits have concluded that age differences of less than 10 years between a plaintiff and his alleged comparators or replacement are too insubstantial to

37

support an inference of discrimination.  See Baguer, 2010 WL 2813632, at *14

(eight-year age difference between plaintiff and replacement too unsubstantial to

support an inference of discrimination); O'Connell v. Consolidated Edison Co. of

N.Y., Inc., 109 F. Supp. 2d 202, 210 (S.D.N.Y. 2000) (granting motion for

summary judgment where the plaintiff was "barely" in the protected age category

and where the decision makers with respect to his termination were also in the

protected age category and were, in fact, older than the plaintiff); Catanzaro v. City

of N.Y., No. 10 Civ. 1827, 2011 WL 335648, at *5 (S.D.N.Y. Jan. 25, 2011), aff'd,

486 F. App'x 899 (2d Cir. 2012) ("age differences of less than ten years have been

found insufficient to support an inference of discrimination") (citing Grosjean v.

First Energy Corp., 349 F.3d 332, 338 (6th Cir. 2003) ("[The] [o]verwhelming

body of cases in most circuits has held that age differences of less than ten years

are not significant enough to make out the fourth part of the age discrimination

*prima facie* case.") (collecting cases)).  This Court's decision in D'Cunha v.

Genovese/Eckerd Corp., 479 F.3d 193, 195 (2d Cir. 2007), permitting an inference

of discrimination based on the fact that an individual who was offered a position in

place of the plaintiff was eight years younger, does not alter this analysis because it

is undisputed that the "younger bankers" to whom Graves points were at most

eight years younger than Graves at the time of his termination and ranged in age up

to 41 – Graves's age at the time of his termination.  With respect to Graves's

proper comparators – other MDs – there is no dispute that Graves was either the same age or younger than all of them except Triffo.

### 3.   The MD Who Was Retained Was Older Than Graves.

Finally, it is undisputed that, when faced with the choice of laying off Graves or Paul, who both covered the broadcasting sector, Amling selected Graves, who was four years younger than Paul, effectively negating any inference that the decision to select Graves was based on his age.  Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 118 (2d Cir. 1991) (retention of three older employees relevant to ADEA claim); Pisana v. Merrill Lynch & Co., Inc., No. 93 Civ. 4541, 1995 U.S. Dist. LEXIS 10296, at *13-14 (S.D.N.Y. July 20, 1995) (granting summary judgment where the retention of an individual who was older than the plaintiff strongly suggested that the plaintiff's termination in a RIF was not pretextual).  Graves's response to this fact is the irrelevant statement that he covered broadcasting in addition to other sectors.  (Br. 32-34.)  Relevant testimony establishes that there was significant overlap between Graves's and Paul's account coverage, and Graves himself conceded that his accounts were predominantly in the broadcasting area.  (A638-A639 (Pl. Tr. 25:23-26:8).)  Graves cannot rebut the undisputed facts that Graves and Paul were both MDs who had overlapping portfolios in a group with excess capacity, Graves was ranked and rated lower than

Paul, Paul is older than Graves, and Graves was the one let go by Amling, who had

hired Graves and was himself in the protected class.

**4.    DBSI Conveyed These Reasons for Its Employment
Decisions to the EEOC and DBSI's Position Statement Does
Not Establish Pretext.**

Graves suggests that the reasons DBSI stated in its Position Statement for

Graves's termination were false and that this demonstrates pretext.  In the Position

Statement, DBSI offered significant evidence and legal argument that supported

the decision to eliminate Graves's position and negated any possible inference of

discrimination.  Among other things, DBSI pointed out that (1) Graves had the

lowest revenues of any MD in the group for 2002 and 2003 (A398); (2) the other

MD who covered similar areas and whose position was not eliminated was four

years older than Graves, and had 18 years of seniority over him (A401); (3)

Amling had hired Graves and was eight years older than Graves (A402); and (4)

with one exception, all of the MDs in the group were either the same age as Graves

or older.  (A397.)

DBSI also demonstrated why the substantive allegations in the Charges were

false or misleading.  As discussed more fully above, DBSI demonstrated that the

Adelphia and Charter accounts generated little or no revenue for DBSI in 2003,

and that the accounts were transferred because of its executives had been charged

with fraud.  (A400; A403; A152.)  DBSI did not state anywhere in its Position

Statement that Graves never raised the issue of account transfers with his managers, as he now misleadingly suggests. (Br. 29-30.) DBSI correctly noted that Graves never complained to anyone that his accounts were being moved to "younger bankers" – an assertion for which he has offered no competent evidence.

For all the reasons noted above regarding Graves's revenues and rankings, discovery has confirmed the assertions contained in DBSI's Position Statement. Following the fact-finding conference and a review of more than 600 pages of written submissions by both parties (A951 at ¶ 3), the EEOC concluded that it could not determine that DBSI had engaged in any misrepresentations. (A948.)

Graves's suggestion that DBSI has taken positions inconsistent with its Position Statement seeks to make DBSI liable under a standard that the law does not require, namely perfect consistency in the reasons first articulated for an adverse job action in an EEOC position statement and throughout the course of discovery. See McDowell v. T-Mobile USA, Inc., No. 04-2909, 2007 U.S. Dist. LEXIS 71591, at *55-56 (E.D.N.Y. Sept. 26, 2007), aff'd, 307 F. App'x 531 (2d Cir. 2009) (because the employer "did not completely backtrack in litigation from its original rationale … discrepancies and defendant's conflicting explanations [are] … insufficient to show pretext.")

As courts in this Circuit have consistently found, the variety of explanations for terminating an employee may simply reflect the "assorted reasons why

Plaintiff's services were no longer needed."  Aneja v. M.A. Angeliades, Inc., No. 05-9678, 2008 U.S. Dist. LEXIS 30602, at *23 (S.D.N.Y. Mar. 31, 2008).  Shifting rationales for an adverse job action must be "radically different" if they are to serve as evidence of pretext.  See Leibowitz v. Cornell Univ., 584 F.3d 487, 504 (2d Cir. 2009); Sarmiento v. Queens College CUNY, 386 F. Supp. 2d 93, 105 (E.D.N.Y. 2005), aff'd, 153 F. App'x 21 (2d Cir. 2005).  DBSI's articulated reasons for Graves's employment termination are consistent with those set forth in its position statement.

In the most cursory and conclusory fashion, Graves argues that the testimony of DBSI's witnesses should be disregarded solely because, in Graves's opinion, "a jury would not be required to believe it."  (Br. 49-50.)  But that is not the question on this appeal; the question is whether Graves has marshaled sufficient, competent evidence to create a material issue of fact.  As explained above, he has not.  Graves also asserts, without any substantive argument, that DBSI should not be able to "profit" from its refusal to provide relevant discovery. (Br. 50-52.)  The only evidence that Graves points to in support of this assertion is a 20-page deficiency letter and a page of a macroeconomic overview of the media industry.  (See SA427, SA477.)  Graves has not specified DBSI's purported refusals or failures to produce relevant discovery, and at no time did Graves seek to compel the production of the documents he has not identified and now

42

misleadingly contends DBSI never produced.  Elsewhere in his brief, Graves states

that DBSI failed to produce documents regarding seniority.  (Br. 34.)  But the

undisputed evidence in this case, produced by DBSI and which Graves has cited in

his Appellate Brief, shows that Paul had 18 years more seniority than Graves and

Graves had the least seniority of any other MD in the Media Group.  (A854.)

Graves's belated complaints about discovery violations are unsupported,

misplaced, and do not relieve him of his burden to present sufficient evidence to

establish the elements essential to his case, and on which he bears the burden of

proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986).

## II.     GRAVES CANNOT ESTABLISH A RETALIATION CLAIM.

Retaliation claims under the ADEA and the NYCHRL are analyzed using

the McDonnell Douglas burden-shifting framework.  Gorzynski, 596 F.3d at 110.

To establish his *prima facie* claim, Graves must show that (1) he participated in

protected activity known to defendant; (2) he suffered an adverse employment

action and (3) a causal connection exists between the plaintiff's engagement in the

protected activity and the adverse employment action.  Id.  Once established, the

burden shifts to DBSI to articulate a legitimate nondiscriminatory reason for the

adverse employment action.  Mattera v. JP Morgan Chase Corp., 740 F. Supp. 2d

561, 568 (S.D.N.Y. 2010).  Finally, the burden shifts back to Graves to

demonstrate that the reason is pretextual.  Id.  "Only where an employer's business

43

decision is so implausible as to call into question its genuineness should [a court] conclude that a reasonable trier of fact could find that it is pretextual".  Fleming v. MaxMara USA, Inc., 371 F. App'x 115, 118 (2d Cir. 2010).  Graves must show that retaliation was a but-for cause of the adverse employment action under the ADEA.  Gross, 557 U.S. at 176; Fried, 500 F. App'x at 41-42; cf. Univ. of Tx. S.W. Med. Ctr. v. Nassar, 2013 WL 3155234, at *14 (U.S. June 24, 2013).

For all the reasons set forth above, Graves has failed to adduce any evidence that DBSI's reasons for his termination were anything but legitimate.  Graves's retaliation claims should be dismissed for two additional reasons:  (1) Graves's termination cannot be the result of Graves's protected activity because his termination preceded his alleged internal complaints of discrimination by six days and (2) Graves has failed to adduce any evidence that any of the employees who were selected for the January 2004 RIF were treated differently.

### A.    The Decision to Terminate Graves's Employment Was Communicated to Him Before His Alleged Complaint.

The principal adverse employment action taken by DBSI, for the purposes of establishing a *prima facie* claim of retaliation under the ADEA or the NYCHRL, was the termination of Graves's employment.  By his own admission, however, Graves learned of his termination on January 14, 2004 (A359 at ¶ 74), and did not

44

allegedly complain to his supervisors until six days *later*, on January 20, 2004.[2]

(A359 at ¶ 77.)  As Graves states, his "retaliation claim involves actions that took

place after January 20, 2004, when Graves informed Brand and DeNaut about

Amling's revelation of age discrimination."  (Br. 54.)  It is self-evident that, where

an adverse action precedes a protected activity, it cannot possibly be the causal

result of the protected activity.  See Kemp v. Metro-North R.R., No. 04 Civ. 9926,

2007 U.S. Dist. LEXIS 43568, at *49 (S.D.N.Y. June 14, 2007) (dismissing

retaliation claim where a transfer decision was made before the plaintiff's EEOC

charge, even though the actual transfer occurred after the charge), aff'd, 316 F.

App'x 25 (2d Cir. 2009).  Graves's termination, therefore, could not have been

motivated by his alleged complaint of discrimination, since both the decision and

its communication to Graves occurred six days before the meeting during which

Graves allegedly complained of age discrimination.

   **B.    The DBSI Actions Allegedly Taken After Graves's Complaint Do
          Not Constitute Retaliation.**

   With respect to the other purportedly retaliatory actions occurring after

Graves's alleged discrimination complaint, Graves claims that DBSI failed to

---

[2] Graves's alleged earlier complaints about account transfers are irrelevant because he has not alleged or argued that he complained of age discrimination until January 20, 2004.  See Kearney, 738 F. Supp. 2d at 431 (finding the plaintiff had not engaged in protected activity, even though she complained that her salary was insufficient, because she did not complain that she was being paid insufficiently because of her age or gender); Garrett v. Garden City Hotel, Inc., No. 05 Civ. 0962, 2007 WL 1174891, at *20 n.18 (E.D.N.Y. Apr. 19, 2007).

provide him with opportunities and benefits that allegedly were customarily provide by DBSI to departing employees.  (A363-A365 at ¶¶ 87-94.) Specifically, Graves points to the following acts:  (1) DBSI's "refusal to reconsider his termination"; (2) "refusal to allow him to save his job by transferring to another part of DBSI"; (3) "refusal to pay him a bonus"; (4) "refusal to increase his severance"; and (5) "refusal to give him a 'soft landing'."  (Br. 54.)  As explained above, however, Graves has failed to set forth any evidence that these concessions were given to other departing employees, that they were withheld from him because he allegedly complained of discrimination, or that the articulated justifications for DBSI's employment decisions surrounding Graves's termination were pretextual.

     *First*, the Bank's refusal to revisit its earlier termination decision, by itself, could not have been retaliatory.  If that were the case, then every employment decision could be retaliatory by virtue of an employer's decision to carry through with the decision rather than change it.  *Second*, the denial of benefits to which an employee would not normally be entitled cannot constitute a retaliatory action under the law because, as they were not existing terms of an employee's employment, their denial could not dissuade a reasonable worker from complaining about discrimination.  See Butts v. N.Y.C. Dep't of Hous. Pres. and Dev., No. 00-CV-6307, 2007 WL 259937, at *16 (S.D.N.Y. Jan. 29, 2007)

(holding that the defendant's refusal to convert leave to compensatory time was not

an adverse employment action for the purposes of the plaintiff's retaliation claim);

Moss v. Port Auth. of N.Y. & N.J., No. 04 Civ. 9631, 2006 WL 3392693, at *8

(S.D.N.Y. Nov. 20, 2006).

As set forth above, neither the continuation of employment or assistance

with a search for alternate employment, payment of a bonus, or increased

severance beyond what an employee was entitled to receive based on duration of

service were benefits or conditions of employment to which Graves was entitled.

The requirement that an act of retaliation be "viewed by a reasonable employee as .

. . materially adverse" is an objective standard.  Kaytor v. Elec. Boat Corp., 609

F.3d 537, 555 (2d Cir. 2010).  The deprivation of Graves's requested "perks" could

not rise to the level of an adverse employment actions under this objective standard

and Graves has failed to satisfy his burden of proving retaliation by presenting

legally sufficient evidence of a materially adverse employment action by DBSI.

All Graves offers in support of his retaliation claim are conclusory

statements that Chang received a transfer, was allowed to negotiate an increase in

her severance, that other employees were given more severance than he was, and

that "Chang and the younger Directors" who were terminated in 2004 were

allowed to work past February 1, 2004" and receive their bonuses.  (Br. 54.)  As

discussed above, it is undisputed that Chang was a Director, not an MD, and she is

47

not an appropriate comparator to Graves.  Graves has not adduced any evidence to support his conclusory statements that Chang or the "younger Directors" were subject to the January 2004 RIF.  In fact, elsewhere he says that "DBSI did not fire Elizabeth Chang in 2004…" (Br. 19.)  Graves's contention that he was somehow entitled to a transfer or to receive a "soft landing" is based on nothing more than his own speculation, and he has adduced no evidence that any similarly situated personnel were offered such opportunities in connection with the January 2004 RIF.

Graves complains that some employees received a larger severance, but the size of severance was a function of an employee's tenure with DBSI (SuppAppx4-5 (listing "tenure for severance")); it is undisputed that Graves had less seniority than others impacted by the January 2004 RIF, and the least seniority of any MD in the group.  Therefore, he received less severance.  He complains that other employees were given longer notice periods.  But Brand and DeNaut testified that they did not recall any employee receiving a longer notice period, which was rarely granted, and then only per DBSI's severance policy for reasons of "a specified economic value", i.e., the employee was working on a transaction that had not yet closed.  (A835 (Brand Tr. 39:1-40:15); A730 (DeNaut Tr. 109:3-112:3).)

Graves complains that others who were terminated later received bonuses. Graves was not paid his bonus in 2004 because he was not there on the date that

the bonuses were scheduled to be paid.  As argued above, DBSI has pointed to

numerous documents, including Graves's offer letter and DBSI policies, that set

forth this precondition for receiving a bonus, but Graves has failed to identify even

one other banker who was given his or her full bonus when the banker was not

employed at the time the bonuses for that year were paid.  Other personnel actually

employed on the February 2004 bonus pay out date would have been entitled,

unlike Graves, to receive bonuses under DBSI's bonus policy, which indisputably

contained a provision that an employee who was not actively employed on the date

the bonuses were paid out would not be eligible to receive a bonus.  (A643 (Pl. Tr.

42:13-43:4); A713.)  Graves has not pointed (and cannot point) to a material fact

that supports his view that DBSI withheld opportunities and benefits from him

because he complained of age discrimination.

### C.    This Court Need Not Determine whether <u>Lambert v. Genesee Hospital</u> Remains Good Law; Graves's FLSA Retaliation Claim Fails Under Any Theory.

Graves attempts to revive his FLSA retaliation claim, which Judge Jones

dismissed on March 18, 2010 partly in reliance on <u>Lambert v. Genesee Hosp.</u>, 10

F.3d 46 (2d Cir. 1993), by suggesting that the Supreme Court's recent decision in

<u>Kasten v. Saint-Gobain Performance Plastics, Corp.</u>, __ U.S. __, 131 S. Ct. 1325,

179 L.Ed.2d 379 (2011) calls <u>Lambert</u> into question.  This Court need not reach

that issue for at least two reasons.  *First*, Graves fails to set forth a legally

49

cognizable FLSA retaliation claim because there is no independent cause of action under the FLSA for retaliation in response to a complaint of age discrimination. *Second*, even if there were a legally cognizable FLSA claim, his claim fails for all the same reasons that his retaliation claim under the ADEA fails.  Accordingly, this Court should affirm the district court's dismissal of Graves's FLSA claim.

### 1.     The Court Need Not Decide Whether <u>Kasten</u> Overruled <u>Lambert.</u>

This Court need not reach the question of whether the Supreme Court's narrow holding in <u>Kasten</u> casts doubt upon <u>Lambert</u>.[3]  Under the FLSA, it is unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter…"  29 U.S.C. § 215(a)(3).  In <u>Lambert</u>, this Court held that the "plain language of this provision limits the cause of action to retaliation for filing formal complaints, instituting a proceeding, or testifying, but does not encompass complaints made to a supervisor."  10 F.3d at 55.

In <u>Kasten</u>, the Supreme Court addressed the narrow question of "whether the statutory term 'filed any complaint' includes oral as well as written complaints."

---

[3] This Court is bound by the decisions of prior panels until they are overruled by an en banc panel of the Second Circuit or the Supreme Court, <u>Adkins v. Warden</u>, 354 F. App'x 564, 566 (2d Cir. 2009), unless an intervening Supreme Court decision "casts doubt" on the prior precedent.  <u>European Cmty. v. RJR Nabisco, Inc.</u>, 424 F.3d 175, 179 (2d Cir. 2005).

131 S. Ct. at 1329 (citing 29 U.S.C. § 215(a)(3)).  In resolving this question, the Supreme Court stated that it was not deciding, and indeed "need not decide," the issue of whether Section 215(a)(3) applies to internal complaints made by an employee to a supervisor.  Id. at 1334.  The Supreme Court explicitly did not address the question this Court answered in Lambert, whether a complaint to a supervisor is sufficient to ground a FLSA retaliation claim.  Id.

As a result, the Supreme Court's narrow holding in Kasten furnishes no basis for this Court to overrule its holding in Lambert regarding the applicability of Section 215(a)(3) of the FLSA to internal complaints, and this Court should reject Graves's invitation to do so.[4]  See Minor v. Bostwick Labs., Inc., 669 F.3d 428, 433 (4th Cir. 2012) ("[W]e take the Kasten majority at its word . . . . Kasten did not settle the question of whether intra-company complaints are protected activity within the meaning of § 215(a)(3)").

_____

[4] Even assuming Kasten's holding applies as Graves suggests, his FLSA retaliation claim nonetheless fails as a matter of law.  Graves's internal complaints in January and February 2004 were based upon age discrimination and not wage and hour violations under the FLSA.  Br. at p. 55, n.14.  Undeniably, a claim of age discrimination is not "sufficiently clear and detailed" in content nor context to place a reasonable employer on notice of a claim under the FLSA.  Kasten, 131 S. Ct. at 1335; see also Kassman v. KPMG LLP, 11 Civ. 3743, 2013 U.S. Dist. LEXIS 17491, at *50 (S.D.N.Y. Feb. 7, 2013) (dismissing the FLSA retaliation claims because "none of these complaints rises to the level of specificity required to state a retaliation claim under the FLSA").

## 2.    Graves Has Not Set Forth A Cognizable FLSA Claim.

Graves alleges that DBSI retaliated against him in violation of the ADEA for making internal complaints regarding age discrimination, and that it violated the FLSA by "retaliating against [him] for having opposed *age discrimination*." (A390 at ¶137 (emphasis added)).  Graves argues only that he "put DeNaut and Brand on notice of his complaint *about age discrimination*."  (Br. 55.)  Graves has not pled or argued that DBSI violated the FLSA by violating wage and hour laws. Instead, he attempts to shoehorn a claim of retaliation for a complaint of *age discrimination* into a separate and distinct violation of Section 215(a)(3) of the FLSA to benefit from "triggering the enhanced remedies" under Section 216 of the FLSA.  (Br. 55 at n.14.)

There is no basis in law for Graves's FLSA retaliation claim.  Tellingly, Graves fails to cite any relevant case law, statute, or other authority to support his position on appeal.  Section 7(b) of the ADEA merely incorporates the enforcement provisions "provided in sections 211(b), 216 (except for subsection (a) thereof), and 217 of [the FLSA]."  29 U.S.C. § 626(b).  Section 7(b) of the ADEA is does not create a separate or parallel substantive cause of action. "Plaintiff also attempts to assert … a claim under the FLSA.  The purported claim under sections 215, 216 and 217 of the FLSA appears to derive from the ADEA's reference to the enforcement provisions of the FLSA.  Because plaintiff's ADEA

52

claim is barred, she has no independent claim under the FLSA." Leiman v. State of New York, No. 98 Civ. 5538, 2000 U.S. Dist. LEXIS 13586, at *18 (S.D.N.Y. Sept. 21, 2000), aff'd, 9 F. App'x 37 (2d Cir. 2001); see also Kimel v. Florida Bd. of Regents, 528 U.S. 62, 74 (2000) ("In accord with that statutory language, we have explained repeatedly that § 626(b) incorporates the FLSA's enforcement provisions"); see also Abrahamson v. Bd. of Educ. of Wappingers Falls Cent. Sch. Dist., 374 F.3d 66, 77 (2d Cir. 2004) ("Section 626(b) provides that 'the provisions of [the ADEA] shall be enforced in accordance with the powers, remedies, and procedures provided in [FLSA]'" (citations omitted)).

Judge Jones recognized the lack of an independent cause of action under the FLSA when a plaintiff has alleged only discrimination (or a complaint of discrimination) based on age as an independent reason for dismissing Graves's FLSA retaliation claim. "Section 7(b) does not create an independent claim under the FLSA but merely makes specified remedies available." (SPCL10 at n.2.) In Chamber v. Capital Cities/ABC, 851 F. Supp. 543 (S.D.N.Y 1994), the plaintiff set forth separate claims under the ADEA and the FLSA, alleging discrimination on the basis of age. Id. at 544. In dismissing the FLSA claim, the district court held that Section 7(b) of the ADEA does not create an independent claim under the FLSA, but merely makes specific remedies under the FLSA available. Id. at 547. Accordingly, Graves's novel attempt to gerrymander the enforcement provisions of

the ADEA into a separate and distinct FLSA retaliation claim fails as a matter of

law.

> **3.     Graves's FLSA Retaliation Claim Fails for the Same
>          Reasons that his ADEA and NYCHRL Retaliation Claims
>          Fail.**

Even if Graves could pursue an independent FLSA retaliation claim based

on a complaint of age discrimination, Graves's FLSA retaliation claim relies upon

exactly the same facts and allegations as his ADEA retaliation claim.  This Court

may affirm the district court's dismissal of Graves's FLSA claim "on grounds

different from those relied on by the court below" i.e., on the same grounds as it

dismissed Graves's ADEA claim.  Shumway v. United Parcel Serv., Inc., 118 F.3d

60, 63 (2d Cir. 1997) (internal citations omitted).  Retaliation claims under the

ADEA and the FLSA are analyzed under the same McDonnell Douglas burden-

shifting framework.  See e.g., Terry, 336 F.3d at 141 (analyzing ADEA retaliation

claims under the McDonnell Douglas burden-shifting framework); Brock v. Casey

Truck Sales, Inc., 839 F.2d 872, 876 (2d Cir. 1988) (stating that FLSA retaliation

claims are subject to the burden-shifting framework established by McDonnell

Douglas).  If Graves cannot succeed on his ADEA retaliation claim, and he should

not for all the reasons noted above, he cannot sustain his FLSA retaliation claim,

which relies upon the same facts, allegations, and analytical framework.

## III.   THE DISTRICT COURT PROPERLY REFUSED TO CONSIDER GRAVES'S IMPROPER SUBMISSIONS.

This Court reviews a district court's disregard of a party's Rule 56.1 statement due to non-compliance with the Local Rules for abuse of discretion.  See Abreu, 329 F.App'x. at 299.  Local Civil Rule 56.1(a) and (d) provide that a party moving for summary judgment must submit "a separate, short and concise statement" of undisputed facts.  The party opposing summary judgment must likewise respond with "a separate, short and concise statement" of facts, identifying any remaining triable issues.  Local Civil Rule 56.1(b).

A non-moving party cannot respond to a moving party's statement of facts by adding unnecessary and prohibited legal argument to its counterstatement.  See Rodriguez v. Schneider, No. 95 Civ. 4083, 1999 WL 459813, at *1 n. 3 (S.D.N.Y. June 29, 1999) ("*Rule 56.1 statements are not argument*.  They should contain factual assertions with citation to the record.  They should not contain conclusions." (emphasis in original)), aff'd, 56 F. App'x 27 (2d Cir. 2003); see also Alliance Security Prods., Inc. v. Fleming  Co., 471 F. Supp. 2d 452, 454 (S.D.N.Y. 2007) ("Such legal arguments, which are plentiful in plaintiff's counter-statement, belong in briefs, not Rule 56.1 statements, and are so disregarded in determining whether there are genuine issues of material fact.") aff'd, 290 F. App'x 380 (2d Cir. 2008); U.S. Info Sys., Inc. v. Int'l Broth. of Elec. Workers

55

Local Union No. 3, No. 00 Civ. 4763, 2006 WL 2136249, at *3 (S.D.N.Y. Aug 1, 2006).

This Court has held that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 73 (2d Cir. 2001). Accordingly, a district court may disregard any improper material contained in Rule 56.1 Statements. See Primmer v. CBS Studios, Inc., 667 F. Supp. 2d 248, 255 (S.D.N.Y. 2009) (denying motion to strike where court would "disregard any materials contained in the affidavits or Local Rule 56.1 Counterstatement that [it] found to be improper").

The district court properly exercised its discretion when it disregarded 90-plus pages of Graves's Rule 56.1 counterstatement that contained "arguments clearly intended to supplement" his brief and ran afoul of Local Civil Rule 56.1's requirement of a "short and concise statement." (SPCL28-30.) Graves's argumentative, voluminous Rule 56.1 counterstatement fundamentally undermined "the purpose of Local Rule 56.1, which is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." Holtz, 258 F.3d at 74. As Judge Jones correctly held, Graves's brazen disregard for Local Rule 56.1 was simply a "poor attempt to garner almost ninety pages of additional briefing." (SPCL29.) In such situations, district courts routinely disregard non-

56

conforming Rule 56.1 statements, and it is well within the proper exercise of their

discretion to do so.  See e.g., Risco v. McHugh, 868 F. Supp. 2d 75, 87 n.2

(S.D.N.Y. 2012) (disregarding plaintiff's non-conforming and argumentative Rule

56.1 Statement); Ross University School of Medicine, Ltd. v. Brooklyn-Queens

Health Care, Inc., No. 09–CV–1410, 2012 WL 6091570, at *6 (E.D.N.Y. Dec. 7,

2012); Smith v. Pilgrim Power Elec. Contracting LLC, No. 09 Civ. 6130, 2011 WL

3962576, at *1 (S.D.N.Y. Sept. 6, 2011).

Graves's Rule 56.1 Statement is akin to a party submitting a brief in excess

of permitted page limits, or submitting a brief after the deadline without leave of

the court or in violation of the judge's individual or the court's local rules.  In such

situations, the district court is free to disregard briefing that exceeds the limits set

forth in the rules.  See e.g., Piazza v. Eckerd Corp., No. 02-CV-0043E, 2003 WL

23350118, at *2 n.9 (W.D.N.Y. Aug. 22, 2003) (disregarding ten pages of the

defendant's reply brief because the defendant did not seek prior court approval to

exceed the set page limit); Inflight Newspapers, Inc. v. Magazines In-Flight, LLC,

990 F. Supp. 119, 123 (E.D.N.Y. 1997); Sommer v. PMEC Associates and Co.

Ltd., No. 88 Civ. 2537, 1992 WL 196748, at *10 (S.D.N.Y. Aug. 5, 1992).  As a

result, the district court acted fully within its discretion.

There is no merit to Graves's argument that the district court "effectively

imposed the sanction of dismissal with prejudice," in violation of his due process

rights, by considering only the 36 conforming pages of Graves's 133-page Rule 56.1 counterstatement. Graves has not cited any authority for the proposition that a district court's disregard of non-conforming court submissions is a sanction or a violation of due process. Graves relies on <u>Mitchell v. Lyons Professional Servs., Inc.</u>, 708 F.3d 463, 467 (2d Cir. 2013) in support of his argument, but <u>Mitchell</u> is patently inapplicable to the current situation. It dealt with denial of a motion for a writ of execution as a sanction against an attorney who had repeatedly disregarded numerous court orders. <u>Id.</u> at 466-467.

Here, even despite Graves's blatant disregard of Local Rule 56.1, Judge Jones granted him leave to correct errors in his 56.1 statement on July 19, 2012 and then on September 25, 2012 she granted him leave to file a supplemental opposition brief – nearly two months after his opposition had been filed – to address an argument he had "inadvertently left unanswered" in his opposition brief. (Br. 8.) These facts do not suggest Judge Jones has failed to give Graves an opportunity to be heard. In addition, the district court did not grant DBSI's summary judgment motion as a sanction for Graves's non-conforming briefing, but based its opinion on a careful review of the record and those portions of the parties' briefing that conformed to the local rules. If Graves is correct that Judge Jones imposed a sanction in violation of Graves's due process rights, any litigant could file a brief that significantly exceeds a court's page limits, or fails to conform

58

to Local Rule 56.1, and then be able to argue on appeal that the district court's enforcement of these rules violated the appellant's due process rights.  This cannot be the law.

## <u>CONCLUSION</u>

For each of the foregoing reasons, DBSI respectfully requests that the Court affirm the grant of summary judgment below dismissing Graves's claims in their entirety and award such further relief as the Court deems just and proper.

**DATED: July 11, 2013**                     Respectfully submitted,

By /s/ Nicholas H. De Baun
   Cliff Fonstein
   Nicholas H. De Baun
   Cameron Smith
   SEYFARTH SHAW LLP
   620 Eighth Avenue
   New York, New York  10018
   (212) 218-5500 (main)
   (212) 218-5526 (fax)

   *Attorneys for Defendant-Appellee*
   *Deutsche Bank Securities Inc.*

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,988 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally space typeface using Microsoft Word 2012 in Times New Roman 14 point font.

 /s/ Nicholas H. De Baun
Nicholas H. De Baun
Attorney for Defendant-Appellee

Dated:  July 11, 2013

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 11, 2013, I electronically filed the foregoing

Answering Brief of Appellee with the Clerk of the United States Court of Appeals

for the Second Circuit using the CM/ECF system, and that counsel for Plaintiff-

Appellant is a registered CM/ECF user.

I further certify that I caused six (6) copies of the foregoing to be hand

delivered to the Clerk of the Court at the following address:

> Clerk of the Court
> United States Court of Appeals for the Second Circuit
> Thurgood Marshall U.S. Courthouse
> 40 Foley Square
> New York, NY 10007

    /s/ Nicholas H. De Baun
    Nicholas H. De Baun
    Attorney for Defendant-Appellee

    Dated:  July 11, 2013